FILED

2026 Mar-30  AM 09:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| Michael Chambers, an individual, | ) | |
| Pro Line Panels, LLC, | ) | |
|     a limited liability company, | ) | |
| | ) | |
|     Plaintiffs, | ) | Case Number: TBD |
| | ) | |
| vs. | ) | |
| | ) | |
| Richard Riley, an individual, | | |
| Simpson Plastering, LLC | ) | |
|     a limited liability company, | ) | |
| Simpson Panel, LLC | ) | Jury Trial Demanded |
|     a limited liability company, | ) | |
| | ) | |
|     Defendants. | ) | |

**COMPLAINT**

Michael Chambers, an individual residing in Alabama, and Pro Line Panels, LLC, an Alabama limited liability company, (hereinafter "Plaintiffs") files this Complaint against Defendants Richard Riley, an individual residing in Alabama, Simpson Plastering, LLC, an Alabama limited liability company, and Simpson Panel, LLC, an Alabama limited liability company (hereinafter "Defendants"), and states as follows:

**PARTIES**

1.      Michael Chambers is an individual and resident of Alabama having an address at 286 County Road 1731, Holly Pond, Alabama 35083.

2.      Pro Line Panels, LLC is an Alabama limited liability company having a principal place of business at 12585 Old Highway 280, Suite 104, Chelsea, Alabama 35043.

1

3. Upon information and belief, Richard Riley is an individual and resident of Alabama. Defendant Richard Riley is the named sole inventor and owner of U.S. Patent 11,459,767 (the "'767 Patent").

4. Upon information and belief, Simpson Plastering, LLC is an Alabama limited liability company formed under the laws of Alabama with a principal place of business at 4767 1st Avenue North, Birmingham, Alabama 35222. The company's registered address is listed the same as the principal place of business address and the registered agent is listed as Richard Riley.

5. Upon information and belief, Simpson Panel, LLC is an Alabama limited liability company formed under the laws of Alabama with a principal place of business at 4767 1st Avenue North, Birmingham, Alabama 35222. The company's registered agent is listed as Richard Riley having a registered address at 30851 Highway 278 Building 1, Addison, Alabama 35540.

## JURISDICTION AND VENUE

6. This action arises under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., under 35 U.S.C. §256 for the correction of inventorship of U.S. Patent No. 11,459,767, entitled "Exterior Finishing Systems For Buildings and Related Methods of Use," which was issued on October 4, 2022, under 35 U.S.C. §271 for judgment of non-infringement of Plaintiffs' exterior panel products, and related state law claims for unjust enrichment, fraud, and intentional interference with contractual and business relations. A copy of U.S. Patent No. 11,459,767 is attached as **Exhibit 1.**

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 2201 and 2202, which authorizes federal courts to declare the rights and legal relations of parties in cases of actual controversy; pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.;

2

and pursuant to 28 U.S.C. § 1338(a), which grants original federal jurisdiction over any civil action arising under any Act of Congress relating to patents wherein the correction of inventorship claim arises under 35 U.S.C. § 256.

8.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Personal jurisdiction over the Defendants is proper in this District because Defendant Riley is an individual residing in Alabama, and both Defendant LLCs are formed in the State of Alabama, maintain principal places of business in Alabama, conduct business in Alabama, and initiated assertions of Trade Secret misappropriation and other business torts against an Alabama resident who is employed by an Alabama company.

10.      Venue is proper in this Court pursuant to 28 USC § 1391 and/or 28 U.S.C. §1400(b) because the Defendants reside in Alabama and/or have an established place of business in this judicial district, and all, or a substantial portion, of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

11.      Michael Chambers is a co-owner of Pro Line Panels, LLC, a company who specializes in designing, manufacturing, and installing exterior paneling for commercial buildings, offices, restaurants, convenience stores, gas stations, and other similar building structures. Mr. Chambers has been in the exterior panel industry for over two decades and initially developed an exterior paneling system in or about 1999, which was an innovative product that reduced installation time when compared to traditional panel systems, such as, "Exterior Insulation and Finish Systems," also referred to as "EIFS".

12.     In 2005, Mr. Chambers started Pro/Line Panels, Inc., a company incorporated in Alabama with a principal place of business in Cullman, Alabama. Mr. Chambers and his company, Pro/Line Panels, installed his innovative panel system at numerous job sites from 2008 to 2009.

13.     In 2009, Pro/Line Panels, Inc. was dissolved, and Mr. Chambers transitioned the business to Pro Line Exterior (a d/b/a/ company), where he continued to develop and install his pro-line paneling system at numerous job sites, many including franchisee restaurants that underwent renovations, including renovating the exterior with the pro-line paneling system. One of the benefits of Mr. Chambers' pro-line paneling system was that the panels could be manufactured off-site, then brought on-site and installed, which reduced the amount of time the construction crews were on-site and decreased the amount of time required to install the panels themselves leading to less downtime of the restaurant or business. The decreased time on-site was an advantage for businesses undertaking renovations because it meant that the business was likely to see a reduced amount of disruption in their day-to-day operations and therefore, a reduction in lost sales during the renovation. Many businesses could stay open during the exterior renovations further reducing any loss of sales due to having to close the store during exterior construction.

14.     On or around September and October of 2010, Mr. Chambers and Pro Line Exteriors had testing performed on their pro-line panel system by a civil and structural consulting engineer located in Pensacola, Florida to receive certifications of the paneling system for installation at job sites in Florida. A copy of the testing report is attached as **Exhibit 2**. The testing included various ASTM standardized tests as well as structural testing of different COOSA Board materials, which were high density closed-cell foam boards with fiberglass reinforcement, and are the main panels attached to a building structure. These panels are often attached to plywood, insulation material, or wood/metal studs that comprise a portion of the exterior of a building. Page

4

57 of **Exhibit 2** provides a listing of COOSA products that were tested, including COOSA Nautical 15, Nautical 20, Nautical 24, Bluewater 20, and Bluewater 26 panels. The testing was limited to the main panel and did not include any adhesive/bonding layer or finishing layer that was used in the complete panel system when installed at a commercial job site. Upon completion of the testing, the pro line panel system received its certification, and various projects were completed in the state of Florida using the system on the exterior of building structures.

15.    In 2014, Mr. Chambers was under the employment of Total Commercial Services ("TCS") during which Mr. Chambers hired Simpson Plastering, LLC as a subcontractor to perform exterior stucco work on a project for TCS. Based on the connection through the project for TCS, Defendants became interested in hiring Mr. Chambers to join Simpson Plastering, LLC and use his pro-line panel system for Simpson's customers. On or about October of 2015, Richard Riley of Simpson Panel, LLC and Chap Jackson of Coosa Composites met with Mr. Chambers. Mr. Riley discussed with Mr. Chambers joining Simpson Panel, LLC and that Mr. Chambers would obtain a potential ownership portion of the company as part of his compensation for bringing his pro-line panel system to Simpson Panel, LLC. On October 15, 2015, Mr. Chambers began working for Simpson Panel, LLC as an employee.

16.    On information and belief, in July 2016, Simpson Plastering, LLC submitted testing done by the same civil and structural consulting engineer located in Pensacola, Florida to receive certifications of the paneling system for installation at job sites in Florida. Simpson Plastering, LLC did not conduct new testing of their own panel system, but reused Mr. Chambers' prior panel testing records. In order to prevent others from knowing the identity of the COOSA Board panel and material, Simpson Plastering renamed all references from "COOSA Board" or similar material

labeling to "MC-15" paneling wherein the "MC" designation stood for "**M**ichael **C**hambers" and the "15" was used from the COOSA Nautical "15" designation.

17.     On or around July 22, 2020, Defendant Richard Riley filed a provisional patent application with the U.S. Patent and Trademark Office naming himself as the sole inventor. On or around July 22, 2021, Defendant Riley filed a non-provisional patent application claiming priority to the provisional application. The U.S. patent application was issued on October 4, 2022, as U.S. Patent No. 11,459,767 ("the '767 Patent") entitled "Exterior Finishing Systems For Buildings and Related Methods of Use" naming Defendant Richard Riley as the sole inventor.

18.     The '767 Patent generally claims an exterior finishing system for buildings that includes a panel comprised of high-density closed-cell foam that is securable to a substrate of a building, a bonding layer disposed upon a surface of the panel comprising water and acrylic polymer, and an exterior layer comprising calcium carbonate disposed upon a surface of the bonding layer. The '767 Patent also claims methods of use for such an exterior finishing system.

19.     As stated previously, Mr. Chambers developed, manufactured, and installed his pro-line panel system more than a decade before Defendant Riley filed the application that issued as the '767 Patent. Mr. Chambers independently conceived of, developed, and began installing an exterior finishing system for buildings that is substantially identical to the system claimed in the '767 Patent. When Mr. Chambers began his employment at Simpson, he disclosed his pro-line panel system to Defendants and provided technical details as to its construction and installation processes.

20.     Specifically, Mr. Chambers' pro-line panel system utilized composite panels made from Coosa Composites, which are composed of closed-cell polyurethane foam reinforced with fiberglass. Coosa Composites manufactures high-density, closed-cell polyurethane foam boards

that are reinforced with continuous strand fiberglass, as described in the technical data publicly available from Coosa Composites, of which said foam boards have been available since at least 2010, as demonstrated by Mr. Chambers' testing in Exhibit 2.

21. Mr. Chambers' process for creating the pro-line panels included the following steps: (a) preparing the Coosa Board composite panel for the project, including cutting the polyurethane foam to a required size as needed based on project specifications; (b) applying a primer base coat to the panel by rolling or troweling on the base coat product, including products commonly used in the Exterior Insulation and Finish System ("EIFS") industry from manufacturers such as Sto Corporation and Dryvit Systems which provide an acrylic and water-based system used as an EIFS base coat (a variety of base coat products exist in the industry for bonding to the composite panels); and (c) applying a finish coat over the primer base coat wherein the finish coat was provided by Sto, Dryvit, or alternatively Sherwin Williams.

22. The finish coats applied to the pro-line panels included a variety of finishes depending on client requirements. Many of these finishes contained calcium carbonate as either a filler or an aggregate to create textured, durable, and protective finish outer coatings for EIFS, concrete, and stucco applications. The finishes included faux finishes replicating the appearance of brick, concrete, wood, stone, and other similar natural materials.

23. For some projects, Mr. Chambers' exterior finish panels were fabricated off-site at a manufacturing facility and then transported to the construction site for installation. These panels were therefore pre-fabricated prior to installation. The method of installation included attaching the fully finished and dried panels to the exterior of buildings, including to substrates such as plywood, metal studs, concrete, insulation, barrier materials, or similar structural components of a building.

24. Between approximately 2008 and 2015 (and continuing thereafter), Mr. Chambers installed or oversaw the installation of the exterior finishing system described above at multiple job sites across multiple states. These installations constituted public use and commercial activity involving the claimed invention well before the earliest possible priority date of the '767 Patent.

25. Each essential element of the invention claimed in the '767 Patent—including the use of high-density closed-cell foam panels, an acrylic and water-based bonding layer, and a calcium carbonate-containing exterior finish layer, all prefabricated off-site and installed on building exteriors, or fabricated on site using typical EIFS techniques—was conceived, developed, and practiced by Mr. Chambers years before Defendant Riley filed the patent application.

26. Mr. Chambers was employed by Defendants from approximately 2015 to 2024. During the course of this employment, Mr. Chambers assisted Defendants in marketing and selling the exterior panel finishing system. Mr. Chambers further helped Defendants develop a system for manufacturing the panels that was similar to, and derived from, the system Mr. Chambers had previously conceived, developed, and used prior to his employment with Defendants.

27. Through this employment relationship, Defendant Riley gained direct, first-hand knowledge of Mr. Chambers' prior conception, development, and use of the exterior finishing system. Defendant Riley knew, or at a minimum should have known, that Mr. Chambers had independently conceived of and developed the exterior finishing system prior to Defendants' involvement with the system, and that Mr. Chambers made significant and material contributions to the conception of the patented invention.

28. Despite this knowledge, Defendant Riley filed the patent application that issued as the '767 Patent in or around 2020 and named himself as the sole inventor, deliberately omitting Mr. Chambers as an inventor.

29.    On information and belief, Defendant Riley did not disclose to the USPTO that Mr. Chambers had contributed to the conception of the claimed invention or that the invention had been previously used, offered for sale, and/or sold.

30.    On or about August 19, 2025, Mr. Chambers resigned from Simpson Paneling due to a breakdown in the working relationship with the management, and a working environment that Mr. Chambers no longer felt supported in. Due to these issues, Mr. Chambers decided to leave Simpson Paneling and seek opportunities elsewhere.

31.    On or about August 25, 2025, Mr. Chambers and Rueben Hernandez Dominguez signed a partnership to begin Pro Line Panels, LLC wherein Mr. Chambers and Mr. Dominguez intended to manufacture, sell, and install the pro-line paneling system created and developed by Mr. Chambers. Mr. Chambers has been in the contracting business for over 25 years, living in central Alabama and conducting/managing projects across the southeast. During his career, Mr. Chambers has developed relationships and contacts with a multitude of contractors, sub-contractors, suppliers, and salespeople, many of these relationships being established well before he joined Simpson. Mr. Dominguez has been in the contracting business since 2005 working throughout the southeast in states such as Alabama, Mississippi, Florida, Tennessee, and Georgia. Mr. Dominguez conducted and managed projects throughout that time and has developed relationships and contacts with a multitude of contractors, sub-contractors, suppliers, and salespeople during his career, many of these relationships being established well before he became co-owner of Pro Line Panels, LLC.

32.    On information and belief, Defendants contacted clients and potential clients of Plaintiffs and asserted that if such clients or potential clients worked with Plaintiffs, and in

particular purchased exterior panels from Plaintiffs, Defendant Riley would sue for patent infringement as owner of the '767 Patent.

33.    At least two clients (hereinafter "Client" or "Clients") had been in active negotiations with Plaintiffs regarding projects that included the purchase and installation of exterior panels onto commercial buildings. On or about October 27, 2025, Plaintiffs received a Purchase Order from one Client for the manufacture and installation of pro line exterior panels and related products and services.

34.    The purchase orders issued by the first Client to Plaintiffs constituted binding contractual commitments for the purchase of pro line exterior panels and related goods and services and created enforceable obligations between the first Client and Plaintiffs.

35.    After the first Client issued its purchase orders to Plaintiffs, Defendants contacted the first Client and threatened that if the Client proceeded with its purchase of exterior panels from Plaintiffs, Defendant Riley would file a patent infringement lawsuit against the Client, asserting the '767 Patent as the basis.

36.    On or about November 26, 2025, Plaintiffs received a repudiation letter cancelling the Purchase Order based on receipt of a notice from Defendants that Plaintiffs' pro line panels infringe the '767 Patent and legal action would be taken should the first Client proceed with purchase of Plaintiffs' products and services.

37.    As a direct result of Defendants threats of patent infringement litigation, the first Client withdrew from, cancelled, or refused to perform under the purchase orders it had issued to Plaintiffs. The project did not proceed. On information and belief, the project was transferred to Defendants.

38.     On information and belief, Defendants have contacted a second Client of Plaintiffs with similar assertions of patent infringement, causing additional business contracts to be disrupted or destroyed.

39.     On or about March 17, 2026, Plaintiffs sent a proposal contract to the second Client for the purchase and installation of exterior panels onto commercial buildings and related products and services. On information and belief, the second client was preparing to accept the proposal contract and release purchase orders to Plaintiffs thereby intending to create a binding contractual commitment for the purchase of pro line exterior panels and related goods and services between the second Client and Plaintiffs.

40.     Prior to the second Client issuing its purchase orders to Plaintiffs, Defendants contacted the second Client and threatened that if the Client proceeded with its purchase of exterior panels from Plaintiffs, Defendant Riley would file a patent infringement lawsuit against the Client.

41.     On or about March 26, 2026, Plaintiffs received a call from the second Client cancelling the Purchase Order based on receipt of a notice from Defendants that Plaintiffs' pro line panels infringe the '767 Patent and legal action would be taken should the second Client proceed with purchase of Plaintiffs' products and services.

42.     As a direct result of Defendants threats of patent infringement litigation, the second Client withdrew from, cancelled, or refused to perform under the purchase orders it had issued to Plaintiffs.

43.     On information and belief, Defendants have contacted or threatened other clients and potential clients of Plaintiffs with similar assertions of patent infringement, causing additional business relationships and economic expectancies to be disrupted or destroyed.

11

44.    Plaintiffs, through its business, have been developing and marketing exterior paneling systems that do not infringe the '767 Patent. While Mr. Chambers has developed and used a variety of different base coats and finishes on his panel systems, currently Plaintiffs are using a primer base coat such that his panel systems do not infringe the '767 Patent.

45.    Claim 1 of the '767 Patent states as follows:

1.  An exterior finishing system for a building, comprising:
    a.  a panel comprised of high density closed-cell foam, the panel securable to a substate of a building;
    b.  a bonding layer disposed upon the surface of the panel, the bonding layer comprising water and acrylic polymer; and
    c.  an exterior layer comprising calcium carbonate disposed upon a surface of the bonding layer.

46.    Claim 3, the other independent claim of the '767 Patent requires the same or similar limitations with respect to the method of forming the exterior panels.

47.    All the '767 Patent claims specifically require the "bonding layer" to comprise "acrylic polymer." This is a material limitation that must be met for infringement under any claim of the '767 Patent. Stated another way, a panel system that lacks a bonding layer comprising an acrylic polymer does not infringe any claim of the '767 Patent.

48.    Plaintiffs' use a base coat primer by the name of Sto Primer/Adhesive-B, Product Identifier 80101, 80101-400, manufactured by Sto Corp. of Atlanta, Georgia. Sto Primer/Adhesive-B is a commercially available coating product. Its composition is documented in a Safety Data Sheet ("SDS") issued by Sto Corp., dated December 5, 2023, Version 1.3. A true and correct copy of the Sto SDS is attached hereto as **Exhibit 3**.

49.    According to Section 3 ("Composition/Information on Ingredients") of the SDS, the composition of Sto Primer/Adhesive-B includes the following principal ingredients:

(a) Quartz ($SiO_2$), CAS No. 14808-60-7, at 60–100% by weight;

(b) Portland cement, CAS No. 65997-15-1, at 10–30% by weight;

(c) Calcium sulfate (sulfuric acid, calcium salt (1:1)), CAS No. 7778-18-9, at 1–5% by weight;

(d) Ethylene-vinyl acetate copolymer, CAS No. 24937-78-8, at 1–5% by weight;

(e) Calcium aluminate cement, CAS No. 65997-16-2, at 1–5% by weight; and

(f) Disodium carbonate, CAS No. 497-19-8, at 0.1–1% by weight.

50.    Critically, the SDS for Sto Primer/Adhesive-B does not list acrylic polymer as an ingredient at any concentration. The polymeric binder component of Sto Primer/Adhesive-B is identified exclusively as ethylene-vinyl acetate copolymer (CAS No. 24937-78-8)—a chemically distinct class of polymer from acrylic polymers.

51.    Ethylene-vinyl acetate copolymer and acrylic polymer are fundamentally different materials with distinct chemical structures, distinct monomer compositions, and distinct properties. Acrylic polymers are derived from acrylic acid, methacrylic acid, or their esters (e.g., methyl methacrylate, butyl acrylate), and are characterized by pendant carboxylate or ester groups along a carbon backbone. Ethylene-vinyl acetate copolymer, by contrast, is derived from the copolymerization of ethylene and vinyl acetate monomers—neither of which is an acrylic monomer—and is characterized by pendant acetate groups along a polyethylene-type backbone

52.    The '767 Patent specification reinforces the distinction between acrylic polymers and other polymer types. The specification identifies a specific acrylic polymer by trade name—Rhoplex EI-2000, commercially available from The Dow Chemical Company—as an exemplary acrylic polymer for the bonding layer. Rhoplex EI-2000 is a well-known pure acrylic emulsion

polymer. Other additional acrylic bonding compositions are provided in Tables 1 and 2, each specifically identifying "acrylic polymer" and none including ethylene-vinyl acetate. Indeed, the specification does not identify, reference, or suggest the use of ethylene-vinyl acetate copolymers as being suitable in the bonding layer.

53.    Plaintiffs' panel systems and processes for making them do not satisfy all limitations of the independent claims and therefore do not infringe any claim of the '767 Patent. Any customers or clients who purchase the exterior panels from Plaintiffs that use the Sto Primer/Adhesive-B also do not infringe any claim of the '767 Patent.

54.    On or about January 13, 2026, Mr. Chambers received a "Demand to Cease and Desist" and "Demand for Preservation" Letter (hereinafter "Cease and Desist Letter") from Simpson Plastering, LLC and Simpson Panel, LLC, sent through their counsel, Shay Persall. A copy of which is attached as **Exhibit 4**. Defendants allege that Mr. Chambers "misappropriated the [Defendants'] confidential and proprietary information and its trade secrets" citing the Alabama Trade Secrets Act, Ala. Code §8-27-1, et seq., and the federal Defend Trade Secrets Act, 18 U.S.C. §1836, "and other federal and state statutes and laws." In addition to the trade secret misappropriation, Defendants alleged Mr. Chambers was violating non-compete and non-solicitation clauses of a "Letter of Intent" signed on "October 19, 2014." Defendants also allege that Mr. Chambers intentionally interfered with contract or business relationships, committed fraud, breached a contract, and usurped corporate business opportunities.

55.    In response to Defendants' demands, counsel for Mr. Chambers contacted Defendants' counsel via email on or around January 28, 2026, acknowledging receipt of the Cease and Desist Letter and requested that specific information related to the trade secrets and confidential information be identified versus the general knowledge of the industry developed by

Mr. Chambers over the course of his career, that any specific conduct that has occurred be identified which relates to who Mr. Chambers allegedly has contacted, and copies of any contractual agreements or handbooks that Defendants allege legally bind Mr. Chambers.

56.    Absent provision of such information by Defendants, Plaintiffs' counsel had no way to counsel Plaintiffs as to what actions were required to comply with the Cease and Desist Letter.

57.    In response to Mr. Chambers' counsel's email, Defendants refused to provide any documents or information and stated, "If no written reassurance is received, as requested, we will be seeking any and all available remedies."

58.    On or around February 10, 2026, counsel for Mr. Chambers reached out again to Defendants' counsel seeking to set up a phone call to discuss the matter further and to understand Defendants' positions so as to provide effective counsel to Plaintiffs on their obligations with respect to the Cease and Desist Letter. Plaintiffs' counsel again asked specifically for Defendants' counsel to provide the identity of alleged trade secrets misappropriated by Mr. Chambers versus any general knowledge known by him, legal basis for the claimed ownership of any such trade secrets, conduct undertaken by Mr. Chambers that is the alleged misappropriation, and any contractual agreements related to Defendants' claims of breach of contract.

59.    On February 11, 2026, counsel for Mr. Chambers scheduled a phone call with Defendants' counsel for 2:15 PM on Monday, February 16, which Defendants' counsel confirmed via email. Counsel for Mr. Chambers sent an electronic calendar invite to Defendants' counsel noting that he would call her at the number she provided.

60.    In the same February 11, 2026, email, counsel for Mr. Chambers again requested the identity of the allegedly misappropriated trade secrets, the legal basis for each such trade

15

secrets, the specific conduct that was being accused, and what agreements Defendants contend remain enforceable and applicable and when copies of each would be provided.

61.    In response, Defendants' counsel acknowledged the calendar invitation but asserted that Defendants would not be providing any further information, and that the only response that interested Defendants was "receiving [Plaintiff's] confirmation that he has ceased the conduct, returned all protected information, and preserved all evidence as directed."

62.    Mr. Chambers' counsel responded on or about February 12, 2026, stating that Mr. Chambers asserts that he does not have any copies of the alleged Letter of Intent, employee handbook, or any other contract asserted by Defendants. Mr. Chambers' counsel stated to Defendants' counsel that, only by Defendants providing such documentation, could Mr. Chambers can be properly advised of his duties to comply with the Cease and Desist Letter and potentially navigate the situation to an "amicable resolution with your client."

63.    On or about February 14, 2026, Defendants' counsel continued to state that no further information or documentation to support Defendants' positions would be provided and Defendants are only interested in compliance with their demands. Defendants' counsel also unilaterally cancelled the telephone conversation.

64.    On February 16, 2026, counsel for Mr. Chambers called Defendants' counsel at the previously scheduled time at the number she provided. Defendants' counsel, through her assistant, refused to speak with counsel for Mr. Chambers.

65.    No further communication has been received from Defendants by Plaintiffs or Plaintiffs' counsel.

66.    Based on the foregoing, a justiciable controversy exists between Plaintiffs and Defendants as to whether Plaintiffs have misappropriated Defendants' alleged trade secrets, as to

whether Plaintiffs are entitled to practice Mr. Chambers' pro-line paneling system technology that he developed prior to being employed by Simpson Paneling, whether Mr. Chambers is bound by any non-compete or non-solicitation clause, and whether conduct by Mr. Chambers results in the intentional interference with business relations.

67.     On information and belief, Defendants alleged trade secrets are generally known or ascertainable through other means.

68.     On information and belief, Defendants alleged trade secrets do not derive independent or significant economic value.

69.     On information and belief, Defendants have not taken reasonable measures to maintain secrecy of any alleged trade secrets.

70.     On information and belief, Plaintiffs have not acquired, disclosed, or used any alleged trade secret of Defendants through improper means.

71.     On information and belief, Defendants do not possess a legally binding contract with Mr. Chambers or Mr. Dominguez that includes a non-disclosure, non-competition, and/or non-solicitation clause.

72.     On information and belief, Defendant Riley's conduct in deliberately excluding Mr. Chambers from the '767 Patent and in claiming sole inventorship of a system that Mr. Chambers conceived and developed constitutes a knowing misappropriation of Mr. Chambers' inventive contributions.

73.     Plaintiffs' pro-line panel systems do not infringe Defendant Riley's '767 Patent.

## COUNT 1: DECLARATORY JUDGMENT OF TRADE SECRET STATUS AND NO MISAPPROPRIATION OF TRADE SECRETS

74.     Plaintiffs repeat and reallege the allegations of preceding paragraphs 1-73, as if fully set forth herein.

17

75.    For the reasons set forth in this Complaint, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to the status of the alleged trade secrets of Defendants and the alleged misappropriation of trade secrets by Plaintiffs.

76.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the pro-line panel system and its manufacture, sale, use, and installation of the same.

77.    Mr. Chambers began developing the pro-line panel system prior to the year 2000, including manufacturing and installing the first pro-line panel system in or around the year 2008. Mr. Chambers has manufactured, sold, and installed hundreds of pro-line panel systems across a variety of job sites in the southeast since 2008. Mr. Chambers had developed a vast knowledge of the contractor industry and specifically manufacturing, sales, and installation of exterior paneling systems, not only of the pro-line panel systems, but also other existing panel systems in the industry. Mr. Chambers developed relationships with a variety of contractors, subcontractors, skilled workers, suppliers, and salespeople in the contracting and construction industry prior to joining Simpson. Some of these long-standing and prior relationships brought business opportunities to Mr. Chambers while he was employed at Simpson.

78.    Mr. Chambers took no confidential or proprietary documents, information, data, knowledge, formulas, processes, trade secrets, or otherwise, from Defendants, nor has such been misappropriated by Plaintiffs. Mr. Chambers has relied on his general knowledge and expertise developed over 25 years in the industry, including his own personal development of the pro-line panel system that was created years prior to Mr. Chambers joining Simpson as an employee. One reason Simpson sought Mr. Chambers to join their company is because of Mr. Chambers' pro-line

18

panel system and his expert knowledge of the exterior paneling industry, which Simpson wanted to sale and exploit to its customers.

79.    Defendants have threatened legal action against Plaintiffs if they do not comply with Defendants' demands. Because a definite and concrete dispute exists between Plaintiffs and Defendants regarding the existence of trade secrets and the allegations of misappropriation, this Court should issue a judicial declaration determining the rights of Plaintiffs against Defendants.

## COUNT 2: DECLARATORY JUDGMENT REGARDING ENFORCEABILITY OF NON-COMPETE AND NON-SOLICITATION PROVISIONS

80.    Plaintiffs repeat and reallege the allegations of preceding paragraphs 1-79, as if fully set forth herein.

81.    For the reasons set forth in this Complaint, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to the status of the alleged provisions of non-compete and non-solicitation limiting the rights of Plaintiffs from carrying out business endeavors.

82.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the ability to contact current and potential customers, contractors, subcontractors, suppliers, and salespeople in order to carry out the business of Pro Line Panels, LLC and for Mr. Chambers to pursue his livelihood.

83.    Plaintiffs have not breached any contractual obligation to Defendants in the form of a non-compete or non-solicitation clause. On information and belief, there is no contractual obligation between Plaintiffs with respect to any non-compete or non-solicitation clause.

84.    Defendants have threatened legal action against Plaintiffs if they do not comply with Defendants' demands. Because a definite and concrete dispute exists between Plaintiffs and Defendants regarding the existence of any non-compete and/or non-solicitation provisions and the

19

allegations of breaching those provisions, this Court should issue a judicial declaration determining the rights of Plaintiffs against Defendants.

## COUNT 3: DECLARATORY JUDGMENT OF NON-INFRINGEMENT

85.    Plaintiffs repeat and reallege the allegations of preceding paragraphs 1-84, as if fully set forth herein.

86.    Under 35 U.S.C. § 271(a), literal infringement requires that the accused product or method satisfy every limitation of at least one claim of the asserted patent. If even a single claim limitation is absent from the accused product, there is no literal infringement

87.    Independent Claim 1 of the '767 Patent requires, inter alia, "a bonding layer disposed upon a surface of the panel, the bonding layer comprising water and acrylic polymer". Independent Claim 3 similarly requires "a bonding layer . . . comprising water and acrylic polymer".

88.    Plaintiffs' bonding layer consists of Sto Primer/Adhesive-B, whose polymeric binder is ethylene-vinyl acetate copolymer (CAS No. 24937-78-8)—not acrylic polymer. The SDS for Sto PAB comprehensively discloses its hazardous ingredients in accordance with OSHA's Hazard Communication Standard (29 CFR 1910.1200) and Canada's Hazardous Products Regulations (HPR SOR/2015-17) and does not identify acrylic polymer in any form or at any concentration.

89.    Because Plaintiffs' bonding layer does not comprise "acrylic polymer" as required by Claims 1 and 3, Plaintiffs' pro-line panel products fail to satisfy all limitations of the independent claims. Accordingly, Plaintiffs' products do not literally infringe Claims 1 or 3 of the '767 Patent.

90.     Because Claims 2, 4, and 5 depend from Claims 1 and 3 respectively, and because Claims 1 and 3 are not literally infringed, dependent Claims 2, 4, and 5 are likewise not literally infringed.

### COUNT 4: CORRECTION OF INVENTORSHIP UNDER 35 U.S.C. §256

91.     Plaintiffs repeat and reallege the allegations of preceding paragraphs 1-90, as if fully set forth herein.

92.     Under 35 U.S.C. § 256, whenever through error an inventor is not named in an issued patent, the court before which such matter is called in question may order correction of the patent to name the actual inventor or inventors.

93.     Mr. Chambers contributed to the conception of the invention claimed in the '767 Patent. Specifically, Mr. Chambers independently conceived of the exterior finishing system that utilizes closed-cell polyurethane foam panels coated with an acrylic and water-based primer bonding layer and a calcium carbonate-containing finish layer and developed methods of prefabricating such panels off-site and installing them on building exteriors.

94.     Mr. Chambers' contributions to the conception of the invention claimed in the '767 Patent were not insignificant in quality when measured against the dimension of the full invention. Indeed, Mr. Chambers conceived of the core inventive concept—the combination of closed-cell polyurethane foam composite panels with an acrylic primer base coat and calcium carbonate-containing finish coats, prefabricated off-site and installed on building exteriors—years before Defendant Riley filed the patent application.

95.     Through error, Mr. Chambers was not named as an inventor on the '767 Patent. The omission of Mr. Chambers as an inventor was the result of Defendant Riley's deliberate decision

21

to exclude Mr. Chambers from the patent application and to claim sole inventorship of an invention that Mr. Chambers conceived and developed.

96.    Under the Leahy-Smith America Invents Act ("AIA"), the requirement that inventorship errors occur "without deceptive intent" has been removed from 35 U.S.C. § 256. Accordingly, inventorship errors—whether intentional or unintentional—may be corrected under § 256.

97.    Mr. Chambers has standing to bring this action because he has a direct and personal interest in the '767 Patent as a true inventor, or co-inventor, of the patented invention. Mr. Chambers' interest includes, without limitation, the reputational interest in being correctly identified as an inventor of the patented technology, as well as any ownership or financial rights that flow from proper inventorship.

98.    The '767 Patent was issued on October 4, 2022, which is less than six years from the date of the filing of this Complaint. Accordingly, no presumption of laches applies to Plaintiffs' claim.

## COUNT 5: UNJUST ENRICHMENT

99.    Plaintiffs repeat and reallege the allegations of preceding paragraphs 1-98, as if fully set forth herein.

100.    Mr. Chambers conceived of, developed, and practiced the exterior finishing system claimed in the '767 Patent. Mr. Chambers further shared his knowledge of the system with Defendant Riley during the course of employment at Simpson and assisted Defendants in marketing, selling, and manufacturing the system.

101.    Defendant Riley received a direct and substantial benefit from Mr. Chambers' inventive contributions, including the knowledge necessary to develop, market, and patent the

22

exterior finishing system. Defendant obtained a United States patent—the '767 Patent—based in whole or in substantial part on Mr. Chambers' prior conception and development of the claimed invention.

102. Defendant Riley was enriched by obtaining sole inventorship and ownership of the '767 Patent, which confers upon him the exclusive rights to make, use, sell, offer for sale, and import the claimed invention for the term of the patent, as well as the right to license or assign such rights to others.

103. Mr. Chambers conferred these benefits on Defendant Riley through his work, knowledge, and contributions during the course of employment by Simpson. Mr. Chambers did not confer these benefits gratuitously, nor did Mr. Chambers intend for Defendant to claim sole inventorship and exclusive ownership of the patented invention to Mr. Chambers' exclusion. Mr. Chambers did not assign his rights in the invention to any of the Defendants.

104. It would be unjust and inequitable for Defendant Riley to retain the benefits of Mr. Chambers' inventive contributions without compensating Mr. Chambers or recognizing Mr. Chambers as an inventor. Defendant's retention of these benefits without acknowledgment or compensation to Mr. Chambers is unconscionable.

## COUNT 6: FRAUD

105. Plaintiffs repeat and reallege the allegations of preceding paragraphs 1-104, as if fully set forth herein.

106. On information and belief Defendant Riley has made material misrepresentations and/or omissions of fact. Specifically, Defendant Riley represented to the USPTO in the patent application that he was the sole inventor of the exterior finishing system claimed in the '767 Patent.

23

This representation was false. Mr. Chambers, not Defendant, conceived of and developed the claimed invention or significantly contributed to the subject matter of at least one claim.

107. On information and belief, Defendant Riley also concealed from Mr. Chambers the fact that he was filing a patent application claiming sole inventorship of a system that Mr. Chambers had conceived and developed. During the course of Mr. Chambers' employment with Defendants, Defendant Riley failed to inform Mr. Chambers that Defendant Riley was filing the patent application as sole inventor.

108. On information and belief, Defendant Riley knew that his representations of sole inventorship were false at the time they were made. Defendant Riley had direct and personal knowledge that Mr. Chambers had conceived of, developed, and publicly used the exterior finishing system years before Defendant filed the patent application. Indeed, at least part of the reason Mr. Chambers was hired by Defendants was to bring his pro-line panel system to Defendants to be offered for sale to clients and customers.

109. On information and belief, Defendant Riley made these misrepresentations and omissions with the intent to deceive the USPTO into granting a patent naming himself as the sole inventor, and with the intent to deprive Mr. Chambers of any rights, recognition, or compensation as the true inventor or co-inventor of the claimed invention.

110. On information and belief, Mr. Chambers reasonably relied on the trust and confidence inherent in the employer-employee relationship and had no reason to believe that Defendant Riley would file a patent application claiming sole inventorship of a system that Mr. Chambers had conceived and developed or significantly contributed to the subject matter of at least one claim.

24

111. As a direct and proximate result of Defendant Riley's fraud, Mr. Chambers has been damaged. Mr. Chambers has been deprived of the recognition, rights, and economic benefits associated with being properly named as an inventor on the '767 Patent, including without limitation any ownership interest in the patent, any right to license or receive royalties from the patented invention, and the professional and reputational value of being credited as the inventor or co-inventor of the patented technology.

112. But for this intentionally and knowingly false conduct, Mr. Riley would not have received the '767 Patent. Consequently, his actions in asserting to actual and potential customers of Plaintiffs that they may be liable for patent infringement if they engage Plaintiffs for paneling work are also fraudulent. These fraudulent acts have damaged Mr. Chambers through lost profits, loss of customer goodwill, and damage to reputation

## COUNT 7: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

113. Plaintiffs repeat and reallege the allegations of preceding paragraphs 1-112 as if fully set forth herein.

114. At all times relevant hereto, Plaintiffs maintained business relationships and economic expectancies with various clients and potential clients for the design, manufacture, sale and installation of exterior panels and related products and services.

115. Plaintiffs had valid and enforceable contractual relationships, as evidenced by the contracts and purchase orders between the Clients and Plaintiffs for the purchase of exterior panels and related goods and services.

116. On information and belief, Defendant Riley had knowledge of the contractual relationships between Plaintiffs and the Clients, including knowledge that the Clients had received contracts from Plaintiffs and/or issued purchase orders to Plaintiffs.

117.    Defendant Riley intentionally interfered with the contractual relationships between Plaintiffs and the Clients by contacting the Clients and threatening that if the Clients proceeded with the purchase of exterior panels from Plaintiffs, Defendants would file a patent infringement lawsuit against the Clients.

118.    Defendants' interference was wrongful and without justification. Defendants' threats of patent infringement litigation were based on a patent from which Mr. Chambers was fraudulently omitted as a co-inventor. Defendants knew, or acted with reckless disregard for the fact, that: (a) Mr. Chambers is a rightful co-inventor of the patent at issue; (b) Defendant Riley's exclusive claim to the patent is based upon the fraudulent omission of Mr. Chambers as an inventor; and (c) Plaintiffs' manufacture, sale, and installation of exterior panels does not constitute patent infringement of a patent to which Mr. Chambers is properly a co-inventor.

119.    Defendants conduct constituted independently tortious and unlawful acts, including but not limited to: (a) making false and misleading representations to the Client regarding the validity of Defendant Riley's exclusive patent rights; (b) threatening baseless patent infringement litigation against the Client for the improper purpose of destroying Plaintiffs' contractual relationships; (c) leveraging a patent obtained through the fraudulent omission of Mr. Chambers to intimidate the Client into breaching or abandoning its contractual obligations to Plaintiffs; and (d) engaging in a pattern of conduct designed to exclude Mr. Chambers from the market for exterior panels by weaponizing a fraudulently obtained patent.

120.    As a direct and proximate result of Defendants' wrongful interference, the Clients withdrew from, cancelled, or refused to perform under the purchase orders they had issued to Plaintiffs, thereby breaching or abandoning the contractual relationship between the Clients and Plaintiffs.

121.    As a direct and proximate result of Defendants' tortious interference with Plaintiffs' contractual relations, Plaintiffs have suffered and continue to suffer damages, including but not limited to: the lost value of the purchase orders that were cancelled or abandoned; lost profits from the project that did not proceed; costs incurred in preparation for performance under the purchase orders; damage to Plaintiffs' business reputation and goodwill; and other consequential damages, in an amount to be proven at trial

122.    But for Defendants wrongful interference, the Clients would have performed under the purchase orders and Plaintiffs would have received the full benefit of the contractual relationship, including all revenue and profits from the sale and installation of exterior panels and related goods and services.

## COUNT 8: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

123.    Plaintiffs repeat and reallege the allegations of preceding paragraphs 1-122, as if fully set forth herein.

124.    In addition to the contractual relationship evidenced by the purchase orders described above, Plaintiffs maintained prospective business relationships and economic expectancies with other clients and potential clients for the sale and installation of exterior panels and related products and services.

125.    These prospective business relationships had a reasonable probability of resulting in future economic benefit to Plaintiffs, including contracts for the purchase and installation of exterior panels.

126.    On information and belief, Defendants knew of Plaintiffs' prospective business relationships and economic expectancies with these other clients and potential clients.

127.    On information and belief, Defendants intentionally and wrongfully interfered with Plaintiffs' prospective business relationships by contacting other clients and potential clients of Plaintiffs and asserting that if such clients or potential clients conducted business with Plaintiffs — and in particular purchased exterior panels — Defendants would file suit against them for patent infringement.

128.    Defendants' threats of patent infringement litigation directed at Plaintiffs' other clients and potential clients were wrongful and improper for the same reasons set forth in the preceding count: they were based on a patent from which Mr. Chambers was fraudulently omitted as a co-inventor, and were made with the knowledge or reckless disregard that Mr. Chambers' manufacture, sale, and installation of exterior panels does not constitute infringement of a patent to which he is properly a co-inventor.

129.    Defendants' interference with Plaintiffs' prospective business relationships was without justification or privilege. The threats of patent infringement litigation were not made in the exercise of legitimate competitive activity but were instead made with the specific intent to harm Plaintiffs' business by exploiting a patent to which Defendant Riley is not solely entitled. Notably, Defendants have not asserted patent infringement allegations against Plaintiffs, but instead only contacted actual or potential clients of Plaintiffs so as to harm any business relations.

130.    As a direct and proximate result of Defendants' wrongful interference with Plaintiffs' business relations, clients and potential clients of Plaintiffs have declined to enter into business relationships with Plaintiffs, have terminated discussions regarding potential projects, or have otherwise been deterred from doing business with Plaintiffs.

131.    As a direct and proximate result of Defendants' tortious interference with Plaintiffs' business relations, Plaintiffs have suffered and continue to suffer damages, including but not

28

limited to: lost revenue from projects and sales that did not materialize; lost profits from business opportunities that were disrupted or destroyed; damage to Plaintiffs' business reputation and goodwill in the exterior panel market; diminished ability to attract and retain clients; and other consequential damages, in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgement in favor of Plaintiffs as follows:

A. The information Defendants claim constitutes trade secrets does not qualify as trade secrets under federal law (18 U.S.C. §1836, et seq.) or Alabama law (Ala. Code § 8-27-1, et seq.);

B. Plaintiffs' conduct does not constitute misappropriation of trade secrets under federal or Alabama law;

C. Plaintiffs have no obligations or limitations under provisions of a non-compete or non-solicitation clause;

D. that Plaintiffs' paneling products, including Plaintiffs' exterior finishing panel systems incorporating Sto Primer/Adhesive-B as a bonding layer, and processes for creating same do not infringe any claim of United States Patent No. 11,459,767;

E. An Order directing the USPTO to issue a certificate correcting the inventorship of United States Patent No. 11,459,767 to include Michael Chambers as an inventor, or as the sole inventor, pursuant to 35 U.S.C. § 256

F. A declaration that Plaintiff is a true inventor, or the sole inventor, of the subject matter claimed in United States Patent No. 11,459,767;

29

G.  An award of compensatory damages in an amount to be proven at trial for Defendant's unjust enrichment, fraud, and intentional interference with contractual and/or business relations;

H.  An award of punitive damages in an amount sufficient to punish Defendants for willful, wanton, and fraudulent conduct and to deter similar conduct in the future;

I.  An award of Plaintiffs' reasonable attorneys' fees and costs incurred in connection with this action because it is an exceptional case pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

J.  Award reasonable attorney's fees and costs pursuant to Code of Ala. §8-27-4, if the Court finds that Defendants' claim of misappropriation was made in bad faith;

K.  Pre-judgment and post-judgment interest as allowed by law;

L.  Award costs of litigation incurred in bringing this declaratory judgment action;

M.  Awarding Plaintiff such other and further relief as the Court deems just, equitable, and proper.

Date : March 27, 2026                          Respectfully submitted,

/s/*Nicolas Gutierrez*
Nicolas Gutierrez
ATTORNEY FOR PLAINTIFFS
BAR NUMBER  0400-J34A
**CORY WATSON ATTORNEYS**
2131 Magnolia Ave S.
Birmingham, AL 35205
Telephone (205) 639-0341
Email: ngutierrez@corywatson.com